May it please the Court, Christopher Curran for Sudan, which takes this opportunity to again express its sympathy for the victims of the USS Cole, but at the same time denies any complicity in that attack. I'd like to begin by addressing the issue of service of process and personal jurisdiction. Section 16. If there's no personal jurisdiction, we don't get to the other issues. You certainly don't have to. That's right, Your Honor. If there's no personal jurisdiction, it's over. For now. That's right, for now. So then it's up to the Court, up to this panel, as to whether to provide additional resolution of the other issues to guide the Court in further proceedings. But again. It would be sort of odd to say, well, we don't have jurisdiction, but we're going to write an essay. Perhaps. Again, this Court is not obligated to address the other issues after finding lack of personal jurisdiction. I don't understand the use of the term obligated. I think that's probably I don't know. I think the question, or at least my question was, how could we? Wouldn't that be an advisory opinion, pure and simple? We don't have personal jurisdiction. Why else would we get into it? Yeah, well, I guess one reason you could get into it is many of the other issues deal with subject matter jurisdiction, right? Under the Supreme Court's Steele Co. and Swint and Sinicam, that line of authority, I think, indicates that this Court has some discretion as to the sequencing of the issues it addresses. Now, perhaps the premise of the question was, if this Court concludes that there's no personal jurisdiction, should it address the other issues? Again, perhaps not. Maybe it would be an advisory opinion. But I guess my point is, it could choose, this Court could choose to address the issues in a different sequence. Why don't you tell us why you think there's no personal jurisdiction? We'll worry about the rest of that stuff later. Understood. Thank you, Your Honor. Well, 1608A3 says that the service package should be addressed and dispatched to the head of the Ministry of Foreign Affairs of the State concerned. That statutory language does not suggest or allow for the delivery of the service materials indirectly. There's no contemplation in that statutory language about an intermediary, let alone an embassy in the United States protected by the Vienna Convention. Now, here, the District Court allowed for the delivery of the service materials through an intermediary, specifically the embassy. The difference here is that the process was addressed to the Foreign Affairs Minister. It was addressed. I mean, the name of the recipient was Foreign Affairs Minister. The address was that of the embassy. Yes. And what I'm asking you is the fact that it says Foreign Affairs Minister. Does that or does it not make any difference? Well, that's a factor in the analysis, I suppose. It's a partial satisfaction of the address part. I would suggest... But the statute itself doesn't speak to address, does it? Well, it says that the package shall be, is to be addressed and dispatched to. So I would say to the head of the Ministry of Foreign Affairs of the concerned state. It doesn't say where, unlike subsection 4, which would seem to indicate A3 is ambiguous on that point, which would seem to me to lead to the question of, particularly in this case where the State Department has a view, what weight do we give that? Well, I think because we're dealing with a treaty that the United States is a member of, I think considerable, strong, heavy weight should be given to the views of the United States. And tell us what your best case is that tells us what weight we are to give the view of the government in this circumstance. I think it's Abbott versus Abbott cited in our papers. And I would suggest that the statutory language does suggest the location of the delivery. When it says addressed and dispatched to, that is, I submit, suggesting that it needs to be sent to the office of the head of the Ministry of Foreign Affairs. It was less a quibble that it wasn't suggesting it. It's that you can't rely on a plain language argument. Well, no, I think I can. I think it is the plain language. I think the plain meaning of addressed and dispatched to the head of the Ministry of Foreign Affairs, the plain meaning of that is you got to send it to the capital of the foreign country. There's no suggestion of an intermediary. And I'd like to address the A4 point where it says the Secretary of State of the United States. First of all, that additional language is necessary because we have at least 50 or 51 Secretaries of State in this country other than the federal one. And furthermore, even that provision, I think, would naturally be read to say the package has to be delivered to the Department of State on C Street in Washington, even though it doesn't give the C Street address. I think someone who said, well, I'm going to send it to the White House because I know the Secretary of State spends a lot of time at the White House, that wouldn't satisfy A4. That would be using an intermediary unauthorized by the statute. Same thing for the Treasury Building. They're both in Washington, D.C., and maybe they could be counted on to forward the package to the Department of State. It's an issue where you really want to turn square corners to avoid default judgments and to avoid litigation over when it's something sufficient and when it's not. And there are times when, particularly at the outset of litigation, it's good to just have a bright-line rule. And the bright-line rule is that it would address to the foreign ministry at the place that the foreign ministry is likely to be located, which is the seat of government. That's right, Your Honor. And I think the overwhelming majority, of course, that have 1608A altogether, where we're dealing with service on a foreign state proper, those courts have, I think, uniformly said that there should be, or almost uniformly, have said that there needs to be a precise compliance. I mean, it's not a context in which to go fuzz it. Correct. I think the courts may be a little bit more lenient under 1608B, which is dealing with commercial enterprises. But that's different. Under 1608A, the courts have required strict compliance. There are Vienna Convention concerns in that circumstance. Correct. Correct. The Vienna Convention applies to the diplomatic outposts. And here, not only do we have the use of an intermediary, but we have the use of an intermediary that is protected and inviolable under the Vienna Convention. And I think we'll be hearing from the United States government in a few moments about its view of the Vienna Convention and that provision. It's the address that's critical to the inviolability of the mission. Because one of the things you worry about with a treaty is the inviolability of the mission. And that can be violated by the service of process addressed to the embassy. Because in this world, very regrettably, we have people taking bombs into industry, into embassies. And bombs sometimes go by mail and the like. So it's one of the critical portions of the treaty. And Article 22 of the Vienna Convention. And that's linked up with not the nominal addressee, but it's also linked up with the address. Where does it go? Well, I think that's right. Of course there's a safety concern, perhaps illustrated best by the incidents in Tripoli a few years ago. But even when there's not a safety or security concern, there's still an offense element to the assertion of government authority, service of process, delivered to the embassy, which is protected under the Vienna Convention. Would there be any less of a safety concern if it went to the seat of government? Are you going to address at all now, or perhaps on rebuttal, the substantial, the actual notice argument? Well, first I'll address both of those points right now, Your Honor, if I may. As to whether there's the same safety concern at the seat of the head of the government. Maybe, maybe not. But the Vienna Convention doesn't protect that. So here we have a treaty obligation that addresses the security and the offense point. So I take it that your argument is the suggestion that you think is implicit in the statute is reinforced by context. Of course. Context of the treaty and the purpose of the definitive nature of the requirements of the statute. That's right. And then finally, perhaps, on the point about notice, about actual notice, here, in the Kumar case, I don't know that the record indicates actual notice or not. With that, I'll take my seat and reserve the remainder of my time for rebuttal. Thank you. Mr. Yellen. Good morning, Your Honors. Louis Yellen from the Department of Justice here today on behalf of the United States. Your Honors, the United States does believe that the text of the statute does require service on the foreign minister at the seat of his place of business. But this Court does not need to decide that. Because even if the Court believed that the statute on its face were ambiguous, the United States' treaty obligations, combined with the legislative history of the statute, make it pellucid that Congress intended to foreclose the type of service that was attempted in this case, which is service on an embassy. Since 1965, at least, the United States has interpreted customary international law, and subsequently the Vienna Convention, as prohibiting any type of service of process on the premises of a mission. That would violate what's considered to be the inviolable nature of a mission. And... One of those cases where reciprocity matters because the United States is objecting all the time to service of process on its embassies. And if we're going to object all the time on that basis under the treaty, we at the same time have got to honor the objections of other governments. We expect them to honor ours. That's precisely right, Judge Wilkinson. And I'd like to underscore that the objection is not simply a policy objection. We prefer not to get service at our embassies. It's an objection that's rooted in an understanding of rights of a sovereign under international law. The reason why our objections, when we make them, are taken seriously by foreign states is because we can point to the Vienna Convention and customary international law as the basis for our objections. It's not that we just don't, we have a policy and a preference. It is quite critical that courts recognize the underlying legal obligation that's created by the Vienna Convention and preceding customary international law. But the Second Circuit doesn't take issue with the government's position with respect to service on an embassy. It makes the distinction between service on an embassy and service through an embassy, does it not? That is, that the service was actually made on the correct person, but because of happenstance or perhaps the difficulty of finding the seat of government in a country like the Sudan, the service was through the embassy. So what is your response to that question? Tell us if there's any distinction in your view between service on the embassy and via the embassy. Your Honor anticipated my response. As a legal matter, there is no difference. The Foreign Sovereign Immunities Act recognizes two types of entities in suits against foreign states. The foreign state itself, which includes political subdivisions of a foreign state and agencies or instrumentalities of a foreign state, which have to have separate legal personhood. An embassy is part of the foreign state itself. And I'd like to hasten to add that the harm that the Vienna Convention guards against is using the premises of the mission, as Judge Wilkinson alluded to a moment ago, in an inappropriate manner. And the preparatory materials to the Vienna Convention in 2012 make it quite clear that what's considered to be a violation of inviolability is not simply serving the ambassador or a person named in the embassy, but it's using the premises of the mission itself to affect service of process. Remember, after all, service of process is an assertion of jurisdiction by our courts, our sovereign authority over the person that's established by service on an embassy is the assertion of our court's jurisdiction over the person who receives the notice. That person then, presumably, is under legal obligation to respond to the service. And that's precisely the dignitary harm that the Vienna Convention sought to avoid. In fact, the preparatory materials make it clear, we have a block quote in the brief, which I would refer the court to, make it clear that even service on the doorstep of the embassy is a violation of inviolability. So you're right, Judge Shunkin, that the Second Circuit made this distinction, but we think it's not a legally supported distinction, and it is one that, if followed, would create significant international friction. You're not conceding that this statute is ambiguous? Not at all, Your Honor. We think that the most natural reading of a statute that directs service on the minister of foreign affairs... Where is the ministry likely to be located and where are the lawyers likely to be located? Precisely right. Apart from that, just in a textual matter, it seems that A2, I guess, and A3 are worded differently. I think it's B2, and A3 are worded differently. The interesting thing to me was that A3 didn't use terms such as reasonably calculated to provide notice. Now, you've got this classic formulation in a due process, in Mullane versus Hanover Bank, and everybody is familiar with it, and Congress is certainly familiar with it. Congress would know how to write reasonably calculated to provide actual notice. It has those phrases in statutes all the time, but here, this was not done, and the difference between A2, A3, and B3, or whatever it is, is significant, I think. I think that's exactly right, Your Honor, and that is the reasoning that led the Fifth Circuit and Magnus and the DC Circuit in a number of cases, including Tranzero and Borat, to construe A3, the service provision applicable to states themselves, as requiring strict compliance and not authorizing substantial compliance with actual notice. And that is consistent with the United States interpretation, the State Department's longstanding interpretation of the statute. And accepting your position here, we would have a direct circuit split between this circuit and the second circuit. Well, Your Honor, that split already exists, or at least the tension already exists, because the DC Circuit has already disapproved service on a foreign state through an embassy that was attempted in Tranzero that was also attempted in Borat, both of those cases, and in both of those cases, the DC Circuit rected that attempted service. So the tension that the second circuit created already exists. It predates this Court's decision in this case.  May it please the Court, moving right into the very question that seems to be at issue. The second circuit and Harrison, both in the original opinion and on rehearing, have found that the argument that is made for you today, in point of fact, this service did comply with the statute. It starts with the premise that subsection 3 does not have the address of the court. It is quite clear that Congress understands judicial decisions. And in point of fact, the comments of Senator Lautenberg, in connection with introducing section 1605A, was designed expressly to repair prior decisions of other courts that the Court found to be out of sequence and inconsistent. And it is significant in that context that there was no suggestion. Is it your view then that A3 is ambiguous then as to the place of service? A3 does not have any reference or requirement as to the place of service. Yes. I don't think it's ambiguous at all. It doesn't require a place of service. Ambiguous. Is the Ministry of Foreign Affairs likely to be located in a thousand different places? Of course not. Just like the Secretary of State for the United States is only, with the Office of the Deputy of Counselor Affairs, which is the subsection 4, is located only in one place. It is that the term Ministry of Foreign Affairs suggests a unit or suggests a single organization. Ministry of Foreign Affairs doesn't suggest a fragmented dispersion of embassies. It suggests a unit or a single organization located in a single place. The issue, as far as I am concerned, is the manner in which it is sent, not where it is to be sent. In the sense that Congress wanted this service to be made on the Minister of Foreign Affairs, it's not so clear. This statute was in existence and remained in existence unchanged. The manner in which it gets there or the manner in which it doesn't get there, because it seems to me that there's no guarantee that something that's dropped off at an embassy is going to work its way through the proper channels that it's made for. It may, it may not, but the embassies vary greatly in confidence. And even if it's dropped off at the Ministry of Foreign Affairs, these kind of things can slip through the cracks. What that gives rise to are failures to respond in time and default judgments and that sort of thing. But it's important, I think, when you're dealing with international obligations like this, to have a good traffic rule, to have good traffic rules. And to have a good traffic rule and not litigious, ambiguous kind of things. Well, what if we have an address for the Minister of Foreign Affairs, but it's delivered somewhere else and the like. I mean, this is, these are rules by which everybody's plugged. And the Article 22 of the treaty makes that very clear. I mean, it makes it very clear. And we could really dump things up trying to overturn those set of understandings. And they're not hard rules to follow. They're not particularly obscure. They can be complied with. Your Honor, the ability for a mailing to arrive overseas, particularly in a conflict area, is much less certain than the conflict area. And the point of fact, that observation was made by all of the district courts that dealt with it. By May, Your Honor, if we start with the Treaty of Vienna, the Treaty of Vienna, the reference to the inviolability of the mission is language that if you read it in context in Section 22, it's designed to assure that there is nothing that is conceded in Harrison, to be sure. The head of mission consents to the receipt of postal service at the mission. Any foreign government can say, we're not interested in getting mail here. But they are, and they accept it. When the mail comes in, it's a rather simple matter to say, not here, we reject, like the United States does, or even if it slips through the crack for a while, ultimately it's to send it to Marsh saying, we do not recognize this, we stand good. The fact of the matter is, those options were available to Sudan throughout the entire procedure and elected none of them. It didn't elect to turn it away. It didn't elect to refuse to accept service in that matter, or to transmit it, which it could have. And in point of fact, it could have, after receipt of it and realizing that it had done, it could have sent it to Marsh and it would have been served. All of which would have created a situation which would have brought us to the fourth exception and then service would have been retried. Mr. Hall, I think you make a valid, I think you make a very valid point. The plain language of the statute does not designate a place. And there has to be some wiggle room between plain language and natural reading. I think that the natural reading recognizes that the particular phrase or requirement of address is not present. Contextually though, and in terms of creating certitude in an area which would seem to call for it, a general understanding that service is to be made at the seat of the court. That would certainly give you certainty if Congress had written that, if it had written it when they repaired the statute. But that's what goes to the natural reading. I understand that, but that point, I'm sorry Judge Duncan, I did mean to interrupt. I apologize. No, please, go ahead. But the fact of the matter is, in Wyoke, and this goes back to the original Rucks decision, and I know Judge Duncan, you were back in Rucks, this was exactly the service that was made in Rucks the first time out. It was made again here. It was made in Harrison. It was made in Wyokes. In every one of those cases, reading to this desire for certainty, the observation of the district courts was always that it's far more reliable for this to be in a diplomatic pouch carried to the head of state than in any other way it's more likely to get there. But when it went to Harrison in the Second Circuit, the real question that was focused was, is this the type of event that is an offense to the Treaty of Vienna? And the Second Circuit, both in the original opinion and on re-hearing, said it is not. The State Department, to which we owe great weight, to its view, says they're wrong. Well, the State Department told the Second Circuit, in both the main appeal, actually, they wrote the identical position in both the main appeal and on re-hearing that is argued here. It was identical. I know. I was there. So what I'm saying to your Honor is, the point has been made. It has been presented to a sister court. It has been rejected by that sister court. One could also say that even though the Second Circuit said great weight, they gave it no weight. I think they considered it for what it is. And the primary issue was, what was the actual offense to the Treaty of Vienna? That was the focus. And in that regard, recognizing the fact that the Embassy can turn it away. It can, you know, the staff looks at it, somebody signs where it says, oh, we shouldn't have taken it. But it seems to me, at the end of the day, that you are arguing for some sort of reasonableness. Whether the delivery was reasonable, or whether it was reasonably calculated to give notice. And then, you know, we're going to involve ourselves, if you leave a bright line, really, to the bottom of the cell, in a bit of a quagmire. And when one of those is presented by the particular form of the envelope here, another is surely going to be presented by this notion you floated of consent. And we're going to say, well, what constitutes Embassy consent? And does it have to be by the Ambassador? Or can it be by a subordinate employee? And what do they have to say? And do they have to sign a certain form? And so, you know, it doesn't take much imagination to know that you get into a host of subsidiary questions, where the context here calls for uniformity, a certain deference to the prerogative of the executive branch in its diplomatic relations and in its foreign litigation. A context which calls for a lot of states to obey the same rules, because reciprocity lies at the heart of the relationship between those states. And you're going to have us overturn a lot of this with what, reading between the lines, and I don't have to read too closely between the lines, is a rule of reason. Or a rule of reasonable notice, or something like that. And that travels in a direction that gets us in trouble with the Supreme Court, I'm sure, and gets the government in trouble in terms of international relations. Well, I'm glad you mentioned that, because we're going to know about the Supreme Court in the not-too-distant future. Because there is a petition for certiorari that is pending currently in Harrison. The Solicitor General has been asked to express his view on whether or not certiorari should be granted. And one way or the other, we're going to know whether or not the Supreme Court declines certiorari or accepts certiorari. And it will go from there. But right now, as far as I'm concerned, Harrison correctly states the law. And it starts with the premise of this law is not a question of due process, because foreign states are not technically entitled to the same due process in the Constitution. That's already been decided by the D.C. Circuit in Price v. Frye. And it's been decided by the Supreme Court years ago, I think in 1812. The question really... Please remind me, when was this case initially filed? This one round of it or the original Rucks case? The original Rucks. In 2004. It does seem anomalous that we are in 2017 addressing the threshold issue of personal jurisdiction with... Your Honor, in 2004, the service was made identical. It came up before the panel. It reviewed jurisdiction. There was a jurisdictional attack. The argument was made by Sudan. This court declined to consider that argument. And as a result, it went back for trial. After trial, it came back up a second time. Ultimately, it was... The only issue that was left was moot, declared to be moot because of a change in the law, 1605A. It was remanded. Judge Dumas entered yet a third judgment dismissing that case. It came back up a third time with this identical service. And the government of the United States did not find any problem with service in its statement of opinion in that case at all. And it ultimately found its way back again, and we went to trial. So, if we're talking about history, in point of fact, this has been sitting in this matter now for roughly 13 years. And here, this is the fourth visit we've had on this same proposition where it's been raised directly or indirectly. Service in this case we have now wasn't from 2004. No, but it was the identical service. Would there have been, in your view, a reason not to use A-4? You simply cited the government's position on A-3. Because you have to fail in A-3. And we concluded, based upon the approval of Judge Dumas, that we were obliged to follow this process. Did not fail. You have to fail for 30 days, and then you get to move into A-4. We didn't fail. A-4 was not available to us. We couldn't have done that. We would have essentially ordered. The only way we get to A-4 is if, essentially, if Sudan had simply said, we don't accept this. We would then have been on A-4 right away, and it would have been, by diplomatic means, and probably actually run the same path. The court, Judge Wilkinson, you make the point, and I think fairly eloquently, don't we need to turn square corners? But I suggest to you that that's what the role of Congress was when it enacted the statute. And when it enacted the statute and it became aware of this body of cases, which, by the way, only exists in the terrorism exception. One thing that I am clear about is that the language of that statute doesn't enact a rule of reason. And, in fact, when you look at the Harrison decision, they say that this sort of bailing here is permissible because it, quote, reasonably could be expected to result in delivery to the intended person. Now, to me, when I read that language about reasonably could be expected to result, that's a gloss on the statute. The statute doesn't, A-3, at least, does not use that terminology. That's correct. I think it was used for a different purpose, Your Honor. I think it was used to suggest that if you, and Your Honor was making the point, well, you could put 1,000 different potential addresses ahead of the foreign ministry. The idea was, no, you can't, because inherent in there, there has to be some logical nexus between where it's going, and that was the language in context. And your argument would be that address is a gloss. That isn't actually in the statute either. You're looking, what we're doing here is trying to make sense of it holistically. Because if it were as clear as all that, it should have been clear when this case first appeared on the horizon. Right. One underlying question I have in this case, related to your position, is I understand the argument made by the government and opposing counsel is, if we were to approve service at this time, in this case, what would the effect be on the United States and other countries? Not a thing. Well, let me finish. Oh, I apologize, Your Honor. Excuse me. The way that I see that coming up, and you can tell us what your thought is on this, that in another country, our embassy could be perhaps more alert than the Sudanese embassy, and they reject the service, whether it's right at the time or a little bit later. But then in their courts, they say, well, you've rejected it, but this is a service that's allowed under our law. And under your law, you allow the same type of service. So there's a certain reciprocity that should apply, even if the United States embassy goes through the process of rejecting the service. And I take it that's the underlying concern that the United States government has, which seems to be a valid concern. It is. And the United States, handling this, routinely advises its embassies to reject the mailing. And if it doesn't, and the brief of the United States in this case says so, we then send a subsequent document, if it were to get through for any reason, which says we do not regard ourselves as having been served, and we are not appearing in the case, et cetera. I understand that point, but it seems like to me that the court in that other country would say, so what, you've rejected it. Your own courts in your own country say that this service is sufficient. Why shouldn't our similar statute be sufficient? Because there's another step. With the rejection, we go to A4. That's what this country requires. If we were to have received a rejection in a reasonable and timely way, whether it was immediately by the return of the envelope or shortly thereafter, within a month or two, saying we do not regard ourselves as being served, and the statute actually says 30 days in the A4 section. So it's very plain, within 30 days. Then what happens is we then have to go past A3, and we have to go to A4. And A4 requires us then to not go to one of the 50 secretaries of state. That's a silly argument. But we are required to serve the Secretary of State Department of Counselor Affairs in the State Department, and they will then serve by diplomatic means. And I should point out to you, the diplomatic means that we cite in this case in our brief is exactly what we do. We then turn around and send it by mail to the embassy in Washington of the foreign state, saying that's the diplomatic means. No, excuse me? No, sir, I'm referring to the briefs in this case. I just do not understand why, if we have a clear rule, and it frankly seems to be permissible reading of the statute and simply consistent with Article 22, I don't understand why we would run the risk of trying to sort of game out how all this is going to play out. Your Honor, this issue, the risk issue that you point out, occurs routinely according to the United States in its statement and its brief. And it handles it by exactly the manner that I just described. The United States has not in its brief or any way in its statement of interest ever pointed out a single episode in which that demurred, the refusal, the rejection, has ever found its way to say we ignore that because there's a different standard in your nation. In point of fact, our process in the United States in terms of foreign sovereign immunity is much more organized and regulated than it is virtually any place else in the world. So this statute, and the only point I want to make to just bring it to a head, Congress decided the language it intended to use. And when in 2008, when 1605 came into existence, it was aware of RUCS. It was aware of why. And they didn't change the language. So what I'm suggesting is that the government's reading, you may not think it's a lot, but it's a permissible reading of the statute. And it's a permissible reading. It's almost like a Chevron 2 kind of situation. Whereas a permissible reading is the context one in which deference to the executive branch is required. And if it's a permissible reading, and if the context is one of respect for the position of the executive branch, which, after all, deals with these kinds of matters, and with service and process, and with international relations in a far more detailed way than we do, why isn't the context one to defer to an executive branch reading that is at least a permissible reading of a statute? And that's why you have some rebuttal now, don't you? I do, Your Honor. Can you address it at that point? I'd be glad to. Thank you, Your Honor. Okay. Thank you. The service of process in RUCS was not the same as what was done here. In RUCS, the plaintiffs not only sent the service package improperly, we say, to the embassy of Sudan in Washington, but they took the further step of pursuing service under 1608A4 through diplomatic means. That fact is established in one of the district court's opinions, and it can be found at 205 U.S. District Lexus 36575 at star 57. I remember that. Thank you. Yeah, which is kind of interesting, right? So we have the situation back in 04 where they took the extra step, and even after that was done, Sudan challenged the propriety of service on the embassy. Nonetheless, when we come around to 2010, the plaintiffs followed the same path with respect to the embassy. So they were on notice that this was an issue, and not only did they not remedy it, they did less than they did in RUCS. Thank you for reminding me, Your Honor. Okay. So then I cited the Abbott versus Abbott case before, and I think that is a strong case for us. It refers to great weight being accorded to the use of the U.S. government as to treaty obligations. The Sumitomo case, which I think is cited in Abbott, says it even more clearly that the courts must defer to the U.S. absent extraordinarily strong evidence otherwise. It's even stronger than a Chevron deference. And here we've got a situation where, as we heard from Mr. Yellen, the United States not only has a reasonable interpretation of the statute and the treaty obligations, but has expressed pretty concrete reciprocity concerns that underscore the importance of that position. And then I think we heard counsel talk about the idea of the diplomatic pouch being a means for the delivery of service in the foreign country. Well, it's hard to think of a more intrusive violation of the Vienna Convention rights than having a service of process coming from a U.S. district court, going to an embassy in Washington, a foreign embassy, with the instruction or the demand that the diplomatic pouch be commandeered for the purpose of service of process back in the home country. That seems to be as offensive a step as one can imagine, short of perhaps an incursion at an embassy. And then perhaps lastly, the notion of waiver or consent. The idea that a mail clerk or a receiving agent at an embassy, be that embassy a foreign embassy in Washington or a U.S. embassy outside the United States, the idea that they can, by signing a receipt or accepting a package, be relinquishing important treaty rights as to the inviolability of the embassy is just far too much. Are you aware of cases, I'm asking because I don't know, where there's been service of process, I'm trying to analogize it to civil cases here and it doesn't work, where you can receive the process, you take it in, then you read it, and then you say, well, we're rejecting it even though we got it. And that that holds up as a valid, that's the way to invalidate service. No, I'm not aware of any such case. In fact, I think the authorities I'm aware of would be the contrary. That once service has been delivered, and in fact, I think outside the FSIA context, even if you drop it and refuse to take it, I think there's authority saying that that can constitute valid service nonetheless. So I think the notion that a mail clerk can sign for something and then later reject it, I just don't see that. But more to my point, Article 22 of the Vienna Convention says that the rights of a state under the convention, including the inviolability provision, can only be waived by the head of mission. So a mail clerk doesn't do it. Unless there are any further questions, I'll sit down. Thank you. Thank you. Mr. Howell, you're reserved for time. Yes, sir. Let me go back to the original Rooks opinion. Council made a comment saying that there was an effort to serve under subpart 4. Let me invite your attention to footnote 15 of Judge DeMar's opinion in which that was discussed. In footnote 15. This is in the original Rooks. In the original Rooks. Yes, sir. And in that, he makes note of the fact that Sudan argued that A4 was not available because there was not compliance with A3. So that was Sudan's argument as to A4. It's not like it was moot. It didn't matter. Quite the opposite. Sudan said A4 does not count. And Judge DeMar said that argument is moot because A3 service did comply. So Rooks was decided under the identical service under A3 done exactly this way. And the A4 issue was declared to be moot and was never subject to further review. And it traveled that way all the way and then once again with the second case, et cetera. So here we are and we're talking about now saying, well, there could be a bright line problem. A4 and A3, here we are talking about the same thing. A document finds its way into a diplomatic pouch. Who put it in a diplomatic pouch? The United States didn't. The plaintiff didn't. In every instance, Sudan does. In every instance, Sudan controls what happens inside its embassy. The only issue is can it go by mail to the embassy? Is that an affront? And because Sudan can turn it away and simply say no or send a DeMar later saying, we don't regard ourselves as being served, which the United States does do in every situation, every single one, and has not ever found it to be a problem. That is the answer to the square corner. Do you have cases where that has come up where the foreign country, after the fact of service, has rejected it and a court has determined that that rejection is valid? Your Honor, the answer is there are cases that are cited where it was deemed to be accepted. The only place where it actually went all the full route was in the case involving the People's Republic of China. It's cited in our brief. And that was where the diplomatic pouch was used under the A4 section. The only A3 sections that are this way are Rooks, Wye, Oaks, and Harrison, and Harrison now in the Second Circuit. It's a narrow issue. It does not come... No court has ever decided that you are aware of that this avenue of rejection of service is available. Well, I think that Harrison makes it plain that it is in the first opinion because they talk about why it's not an affront. And that was one of the reasons is it could simply be turned away. But Sudan didn't turn it away. Sudan did not turn it away. It certainly could have. As a matter of fact, actually, that's not entirely correct. Sudan did in 2015 turn away and refused to transmit the entry of judgment that way. You're talking about who turned it away? The embassy. The embassy? Yes, sir. But doesn't that defeat the whole purpose of the statute? I don't think so. To lodge the authority to accept or reject within the foreign ministry. No, sir. I think that the point of the matter is the Congress chose the language it intended to use. It had the authority to choose that language. And that language permits this service to be done that way. And while we may say other language might be more suitable, Congress writes the language. You have to live with that. But Congress did use the words foreign ministry. It did not use the words embassy. It did not. This kind of situation could devolve where the authority to accept or reject devolved from the foreign ministry to the particular embassy. With all due respect, Your Honor, that is exactly the point I believe that Harrison made, which is essentially that when it cited all the other cases in which this has occurred and the argument was that Sudan could turn it away, which is referred to expressly, and they found that because of that it was not an affront to the Treaty of Vienna. The Treaty of Vienna, Section 22, has very specific language in it, and it doesn't really smack of the situation when it talks about inviolability. What they're talking about is no one can enter without the permission of the head of the mission. Mail arrives there with the permission of the head of mission. All of this business about who accepts and who rejects and what constitutes an acceptance and what constitutes a rejection, it frankly seems to me a gloss on the statute because what we're talking about here doesn't locate to me or doesn't link up with the language that the statute is using. But anyway, we've given you an excess of time on the motions. And an intellectual exercise that I've thoroughly appreciated, Your Honor. But nevertheless, I hope that you will follow the Harrison court and rule accordingly. Thank you, Your Honor. Thank you. We'll come down and greet counsel and move into our next case.
judges: J. Harvie Wilkinson III, Allyson K. Duncan, G. Steven Agee